# THE BALTIMORE AND OHIO RAILWAY COMPANY

*v.*

# WINSLOW.

---

TRUSTS AND TRUSTEES; LEASES; ESTOPPEL; CONDEMNATION OF LAND; SPECIFIC PERFORMANCE.

1. *Quære,* whether trustees to whom land has been devised in trust for the sole and separate use of a married woman for life with the right in her to have the use and occupation thereof, to receive and receipt for the income therefrom without the intervention of the trustees and to direct a sale thereof and investment of the proceeds, have the right with the assent of the life tenant, to provide in a lease of the land to a railroad company, that the company shall have the right thereafter to purchase the property in fee-simple, with a good and valid title, for a specified sum of money.

2. It is not necessary to the validity of a lease of land that the lessee should have joined in its formal execution by signing it.

3. Where, by a series of leases and renewals, land has been leased to a railroad company by trustees to whom it was devised in trust for

the sole and separate use of a married woman for her life, and she has received the rent reserved, neither she nor the trustees, after the term created by the last lease has expired, will be permitted in equity to repudiate the leases because the life tenant failed to join in the execution of some of them, and because but one of the three trustees executed the last one, one of his co-trustees having been abroad and the other having resigned his trust and been relieved and discharged therefrom.

4. Where, under a lease of land to a railroad company, containing a provision which is not enforceable, giving the company the right to purchase the land for a specified sum, the company is given a license to enter upon the land and construct its road, and does so, an action at law by the lessor for the dispossession of the company will be enjoined in equity, if the company is willing to make compensation for the use and occupation of the land, such compensation to be fixed by condemnation proceedings.

5. Where trustees to whom has been devised land for the sole and separate use of a married woman for life have agreed in a lease thereof to a railroad company to sell the land to the company, for a specified sum, and it is doubtful whether they had authority to enter into the contract for sale, and the company has the power to acquire the land by condemnation, specific performance of the contract of sale will not be decreed.

No. 1087.  Submitted May 24, 1901.  Decided June 18, 1901.

HEARING on an appeal by the complainant from a decree of the Supreme Court of the District of Columbia dismissing a bill in equity to enjoin proceedings at law. *Reversed.*

The COURT in its opinion stated the case as follows:

This is a suit in equity instituted in the Supreme Court of the District of Columbia by the Baltimore and Ohio Railroad Company, the appellant here, as complainant, against the appellees, as trustees under the will of Catherine Pearson, deceased, to enjoin certain proceedings at law begun by said trustees to recover the possession of lots numbered 9, 10, 11 and 12, in Square 710, in the City of Washington, held by said railroad company, and over which the tracks of its Metropolitan branch are constructed.

Catherine Pearson, who died prior to August 1, 1872, and who, at the time of her death, was the owner of the lots

of ground mentioned, left a will whereby she, after some be-
quests not here important to be stated, devised all the rest
and residue of her estate, which included the lots in ques-
tion, to trustees therein named upon certain specified trusts.
It is this portion of the will which enters into the present
controversy; and it reads as follows:

"All the rest and residue of my estate, real and personal,
wheresoever situated, I give and devise to Carlisle P.
Patterson, William H. Philip and Walter S. Cox, or the
survivors or survivor of them, to be by them held as trustees
for the sole and separate use of my dear daughter Eliza Pat-
terson during the term of her natural life, and so that the
same shall not be liable for the debts or subject to the con-
trol, contracts or engagements of her present or any after-
taken husband; to permit her by herself, or her special attor-
ney appointed in writing to be signed by her, to receive the
annual income and profits of the same for her own sole and
separate use, her receipt or that of her attorney so appointed
as aforesaid alone to be an acquittance to the person or per-
sons charged with the payment of such income or any part
of the same and to the extent only therein expressed to have
been paid; and if she pleases to occupy, possess, and use for
her own account, accommodation, and convenience and that
of her family any part of the property, real and personal, so
held for her separate use and benefit, she shall be allowed to
do so; and if at any time the said Eliza Patterson shall, in
writing to be signed by her in the presence of and to be at-
tested by a subscribing witness, desire the said Carlisle P.
Patterson, William H. Philip, and Walter S. Cox, or the
survivors and survivor of them, to sell any part of the estate,
real and personal, held by them for her separate use, for the
purpose of changing the investment thereof, it shall be law-
ful for the said named trustees, or the survivors and sur-
vivor of them, to sell the same for such purpose, and to
transfer and convey the absolute estate in fee therein, to the
purchaser thereof; and to invest the same in such manner
as the said Eliza W. Patterson may require; and such new in-
vestment shall be held by the said trustees for the same use,

trusts and purposes and with the same powers and authority of sale and reinvestment as is herein declared of and concerning the original trust subject and separate estate.

" And after the death of the said Eliza W. Patterson the said named trustees and their successors shall hold the said trust subject and separate estate, original and subsequently acquired by sale and reinvestment, for the use and benefit of any child or children of the said Eliza W. Patterson, and the issue of any child or children of the said Eliza who may die leaving issue in the lifetime of said Eliza, and such issue shall take the share or portion of the said estate which their parent or parents would have taken had they survived the said Eliza.   And if the said Eliza W. Patterson shall die without leaving a child or children, or issue of any child or children, living at the time of her death, the said trustees and their successors shall hold the said trust subject and separate estate for my right heirs.   And if it shall happen that either of the said trustees shall die, or become incapable of acting, or shall refuse to act in the execution of said trusts, then and in every such case, the continuing trustees or trustee shall from time to time nominate some other person or persons, to be approved by the said Eliza W. Patterson, to be trustee or trustees in the place and stead of the person or persons so dying or becoming incapable or refusing to act, and shall convey and settle the said trust subject and separate estate in such manner that the same shall be legally vested in such continuing trustees or trustee, and such person or persons so named and appointed to that office for the same use, trusts and purposes and with the same power and authority of administration, sale and reinvestment, as is hereinbefore declared of and concerning the said trust subject and estate, and the said new trustee or trustees shall have the same power to act in the premises in conjunction with the continuing trustees or trustee and as survivors of them, as if they had been originally named trustee or trustees in the premises in this my last will and testament."

This will purports to have been executed on December 4, 1862.   Of the trustees named in it Carlisle P. Patterson was

the husband of the beneficiary, Eliza W. Patterson, who yet survives. He has departed this life, as has also his co-trustee, William H. Philip; and the third trustee, the Hon. Walter S. Cox, late one of the justices of the Supreme Court of the District, has resigned and been discharged from the trust. In their places the appellees, Francis Winslow, a son-in-law of Mrs. Eliza W. Patterson; Augustus Jay, a grandson of the testatrix Catherine Pearson, and the American Security and Trust Company, a body corporate in this District, have from time to time been appointed; and they now hold the trust estate mentioned under the will of Catherine Pearson.

By an act of Congress of July 25, 1866 (14 Stat. 250), the Baltimore and Ohio Railroad Company had been authorized to extend the Metropolitan branch of its road into the District of Columbia, with the same rights as it held in Maryland, including the right to acquire property by purchase or condemnation for the construction and use of the road; and subsequent statutes empowered it to extend said branch into the city of Washington over a specified route. This route comprised the lots of ground hereinbefore mentioned. While the railroad company was engaged in the construction and completion of this work, instead of acquiring the lots in question by condemnation, it entered into a lease with the trustees under Mrs. Pearson's will, who were then the original trustees named by the testatrix, whereby the trustees leased the lots to the railroad company for a term of five years from and after August 1, 1872, on the payment of the yearly rental of $755.55 in each and every year, with the privilege to the railroad company to purchase the property at any time during the term for the sum of $12,592, and to receive a good and sufficient deed thereof; and with the further privilege that, at or before the expiration of the term, on the request of the railroad company, the trustees would renew the lease, with the same agreements and privileges, for another term of five years, or until such time as they would be prepared to convey the premises with perfect title in fee-simple; and also with the further provision that, in the event

of the omission of the railroad company to make a request for the renewal of the lease at or before the expiration of the term, the trustees were required to notify the company of such expiration, and to request it to exercise its election to renew the lease, and the privilege of renewal should continue for three months after such notice.

There seems to have been no formal renewal of this lease at the time of its expiration in 1877; at least no renewal is disclosed by the record. But on February 1, 1883, another lease to the railroad company for a term of five years from and after August 1, 1883, was executed by the then existing trustees, Walter S. Cox, Augustus Jay and Francis Winslow, with whom the beneficiary, Mrs. Eliza W. Patterson, herself also joined in the execution of the instrument, wherein there was no reference to any previous lease, but the rent reserved was the same as in the lease of 1872, that is, $755.55 a year, as were also the privileges for purchase at $12,592, and for further renewal.

Again on January 30, 1888, another lease, identical with the last in every respect except the dates, and except also, that Mrs. Patterson herself did not execute it as a party, was executed by the same trustees and the railroad company for a term of five years from and after August 1, 1887.

On October 17, 1892, a new lease, identical in terms with the previous one and purporting to be made by the same trustees, for a further term of five years from and after August 1, 1892, was executed and delivered to the railroad company by Francis Winslow alone, as trustee. It would seem that Mr. Justice Cox had then withdrawn from the trust and no successor to him had been appointed, and that the other trustee, Jay, was absent in Europe, where he had become domiciled; so that Winslow at this time, although himself often absent from the District of Columbia and from the United States, remained the only active trustee.

No other formal lease seems to have been executed. But on August 4, 1897, three days after the expiration of the last mentioned, the railroad company notified the trustees of its desire for a renewal for a further term of five years. To

this request Mr. Justice Cox replied that he was no longer trustee, and that Jay was absent in Europe; and he referred the company to Winslow as the acting trustee. Winslow, in course of time, answered the request in the following terms in a communication to one of the attorneys for the company:·

"My understanding is that originally the railroad company, wishing to purchase the property, could not do so on account of some deficiency in the title. The immediate use of the property being necessary, a lease was made, but in such form as would compel the transfer of the lots at the price agreed whenever a clear title could be given. Pending the transfer, the railroad company was to pay 6 per cent. on the deferred payment. The renewal of the lease has always been made under the same reciprocal conditions and obligations, and I do not feel authorized to change them; but I suggest, as we are now able to furnish a satisfactory title, the present is a suitable time to transfer the property. I inclose a more formal notice in reply to a letter received from the railroad authorities."

The more formal notice referred to was in the following terms:

"In reply to your letter in relation to the renewal of the lease of the lots in Square 710 in this city, I beg to say that we are now prepared to convey the property with a perfect title, and prefer executing such conveyance to renewal of the lease."

This was on September 27, 1897. During the whole period from the beginning of the first lease in 1872 it seems that checks for the rent as it became due were drawn by the railroad company to the order of the trustees and were indorsed by the trustees, or by one of them in the name of all, to Mrs. Eliza W. Patterson, who was entitled to receive the money under Mrs. Pearson's will. Frequently Mrs. Patterson was in communication with the officers of the railroad company with reference to these checks, and how they were to be drawn, and where they were to be sent. These communications continued as late as February 5, 1898, on which

day she requested some modification of a check that had been
sent to her on account of the absence both of Jay and Win-
slow, the trustees, from the United States; and she con-
tinued to receive the rent, which seems to have been paid
semi-annually, up to August 1, 1898.

On August 12, 1898, a check was sent to Winslow, trus-
tee, by the company, for $377.77, apparently for the semi-
annual rent due and payable on August 1, 1898. This check
was received by Winslow, but not cashed; and on inquiry
by the company in regard to it in January of 1899, Win-
slow wrote, under date of January 31, 1899, the following
letter to the company's treasurer:

"I am in receipt of your letter of January 20th in rela-
tion to the voucher for rent for the premises in Washington.
The voucher was received, but pending advice of counsel no
action was taken in regard to it. I am advised that the com-
pany are and for some time have been only tenants at suffer-
ance; and I have notified Mr. McCubbin (land agent of the
company) of that fact, and invited a proposition from the
company. Pending a more definite arrangement than now
exists, I do not feel justified in accepting payments without
the company's full understanding of my position, and have
therefore suspended action on the voucher."

Further correspondence ensued between Winslow and the
land agent of the company, of which the result was that the
company first requested a new lease and finally tendered
itself ready and willing to pay the purchase money, the sum
of $12,592, specified in the agreements heretofore men-
tioned, upon the execution and delivery to it of a proper
deed; and that Winslow declined both propositions, with this
statement: "We prefer to sell the property rather than lease
it, but neither in case of sale or lease could we be governed
by conditions or prices existing some twenty-five years ago."
It appeared that the property had become appreciated in
value, the testimony in the record being that it is now worth
upwards of $30,000.

There were further negotiations continued until about the
end of February, 1900, without definite result or special

bearing upon the controversy as it now stands before us; and they need not, therefore, be here stated.

Finally the controversy culminated in legal proceedings. On March 8, 1900, in pursuance of a previous notice to quit, the appellees here, as the existing trustees, instituted proceedings before a justice of the peace to dispossess the company and to recover possession of the property. The company, not desiring to have two trials, permitted judgment to be entered by the justice by default, and forthwith appealed from such judgment to the Supreme Court of the District of Columbia, wherein the cause is yet pending. Subsequently, and while the said proceeding was so pending, the company instituted the present suit by filing its bill in equity to restrain the said proceeding at law, and also another suit which had been instituted to recover for use and occupation; and also to have a conveyance of the property at the price and according to the terms of the lease of August 1, 1872, and the several subsequent renewals thereof; and, if necessary, for a further renewal lease for five years from August 1, 1897; and also for general relief.

There was a temporary restraining order issued, which was afterwards continued to the final hearing. Thereupon answer was filed, and testimony was taken. At the final hearing, the court below dissolved the injunction and dismissed the bill of complaint; and from the decree the present appeal has been prosecuted.

*Mr. George E. Hamilton* and *Mr. M. J. Colbert* for the appellant:

1. A great deal of stress is laid upon the fact that the lease of October 17, 1892, was signed by only one of the trustees — Mr. Winslow. As a matter of fact — and it appears from all of the correspondence — Winslow was the managing trustee, and at this time the only trustee in this country. As shown from the record, Mr. Jay, the other trustee, was continuously absent in Paris, and apparently was a trustee in name only, and Winslow had the authority

to receive these drafts made payable to his order, and to collect and apply the proceeds. In other words, from the written acts and transactions evidenced in writing, Winslow was the agent of the other trustee for the purpose of attending to this business, and his acts with regard to the lease of 1892 will be considered the acts of the other trustee. Tiffany & Bullard on the Law of Trust and Trustees, 539 *et seq.; Ex parte Rigby,* 19 Ves. 463; *Sinclair* v. *Jackson,* 8 Cowen, 543; *Bowes* v. *Seegers,* 8 W. & S. 222; *Abbott* v. *The Rubber Company,* 33 Barb. 579; *Leggett* v. *Hunter,* 19 N. Y. (5 Smith) 445; *Messeena* v. *Carr,* 9 L. R. Eq. 260. And actions unauthorized, when performed by a single trustee, in respect to the trust estate, may be subsequently ratified and validated, either in writing or *in pais,* by his cotrustee. *Insurance Company* v. *Chase,* 5 Wall. (U. S.) 512; *Blanchard* v. *Waite,* 28 Me. 59. If, as we contend, the lease of 1892 was valid, then we were entitled, under its provisions, to a renewal of said lease in 1897.

2. Whatever may have been the defects in the agreement, or however wanting the trustees may have been in the power to sell, they, with Mrs. Patterson, stood by and permitted the company to construct its tracks, and they should not now be permitted to undertake or prosecute proceedings which would enable them to sever a line of commerce which, by their assent and even permission, was constructed over these lots and has been in operation for more than a quarter of a century. *McAulay* v. *Railroad Company,* 33 Vt. 311; *Railroad Company* v. *Reddick,* 17 A. & E. R. R. Cases, 107; *Pryzblowich* v. *Railroad Company,* 17 Fed. Rep. 493; *Goodman* v. *Canal Company,* 18 Ohio, 179; *Railroad Company* v. *Brown,* 37 Mich. 531. In the cases where ejectment had been brought and judgments obtained, courts have, by injunction, restrained execution on the judgment until the company could exercise its right of condemnation, or until, by proper reference, the right of the owners to compensation could be ascertained. *Railroad Company* v. *Bruce,* 10 A. & E. R. R. Cases, 1; *Railroad Company* v. *Heirs of Henry Stanley,* 35 N. J. Eq. 283; *Railroad Company* v.

*Taylor*, 22 A. & E. R. R. Cases, 123; *Railroad Company* v. *Turner*, 31 Ark. 494; *Provolt* v. *Railroad Company*, 57 Mo. 256; *Gray* v. *Railroad Company*, 81 Mo. 126.

*Mr. Calderon Carlisle* and *Mr. Wm. G. Johnson* for the appellees:

1. The bill is not maintainable against the trustees. Specific performance of contracts for the sale of real estate will not be decreed in all cases. The exercise of the power is discretionary and, it is submitted, will never be exercised to compel trustees holding a mere naked title to perform a contract by which the *cestui que trust* will be deprived of the beneficial estate. Not only are the trustees here mere naked trustees, but the beneficiary and remaindermen are not parties to the alleged contract, nor even parties to the cause, while complainant's own testimony shows the property to be worth from $14,691.75 to $18,889.25 more than the alleged contract price. *Jones* v. *Holladay*, 2 App. D. C. 279.

2. Even if the court could properly require specific performance by trustees in such a case, the record here clearly shows that there never was any valid contract of sale to be enforced. *Powles* v. *Jordan*, 62 Md. 499; *Richardson* v. *Crooker*, 7 Gray, 190; *Kissam* v. *Dierkes*, 49 N. Y. 602; *Alley* v. *Lawrence*, 12 Gray, 373; *Barber* v. *Cary*, 1 Kern. 397.

3. The provision for renewal in the lease does not avail the appellant. The several leases offered in evidence contain an agreement for renewal. This covenant does not amount to a perpetuity, but gives the right to but one renewal. *Hyde* v. *Skinner*, 2 P. Wms. 196 (1723); *Tritton* v. *Foote*, 2 Brown Ch. 636 (1789); *Moore* v. *Foley*, 6 Ves. Jr. 232 (1801); *Rutgers* v. *Hunter*, 6 Johns. Ch. 215 (1822); *Carr* v. *Ellison*, 20 Wend. 178 (1838); *Cunningham* v. *Pattee*. 99 Mass. 248 (1868); *Banker* v. *Braker*, 9 Abb. (N. S.) 411 (1880); *Syms* v. *The Mayor*, 105 N. Y. 153 (1887); Taylor on Land. & Ten., Sec. 333. A further reason for limiting the covenant for renewal to a single renewal is the lack of

power in the trustees to create a perpetual lease. A perpetual lease would bar the remaindermen's rights of possession and sale, and is, therefore, beyond the power of the trustees. Moreover, it would absolutely defeat the right, expressly given to the beneficiary of the trust, Mrs. Patterson, by the will.

4. All rights and pretense of rights in the appellant, under the several leases, expired July 31, 1897. That the act of Winslow, alone, could not bind his cotrustee and the estate committed to them and their beneficiary is well settled by authority. *Sinclair* v. *Jackson,* 8 Cow. 543; *Ridgley* v. *Johnson,* 11 Barb. 527; Hill on Trustees (3d Am. ed.), 445; *Latrobe* v. *Tiernan,* 2 Md. Ch. D. 474.

5. The gross inequity and lack of mutuality in the alleged agreement is a bar to its enforcement by a decree for specific performance. The trustees had no right to place the trust estate at the capricious disposition of the railroad company; they have not done so in fact; but, if they have, such an inequitable contract is not one which a court of equity will specifically enforce. *Gieger* v. *Green,* 4 Gill, 472; *Marble Company* v. *Ripley,* 10 Wall. 339; *Brashier* v. *Gratz,* 6 Wheat. 528; *Duvall* v. *Myers,* 2 Md. Ch. D. 401; *Parkhurst* v. *Van Cortlandt,* 1 Johns. Ch. 274.

Mr. Justice MORRIS delivered the opinion of the Court:

The question principally argued before us in the case is, whether, in the execution of the lease of August 1, 1872, and of its subsequent renewals, the trustees of the estate of Catherine Pearson acted within the scope of their authority as such trustees, when they inserted, or caused to be inserted, therein the provision that the railroad company should have the right thereafter to purchase the property in fee-simple, with a good and valid title, at a certain specified sum of money; and this question we deem it unnecessary to determine. We may say, however, that such an arrangement entered into with a railroad company, armed with the power of the State to prosecute a great public enterprise, and em-

29

powered for that purpose to take property by the exercise of the right of eminent domain, may stand upon a somewhat different basis from a similar arrangement entered into with an ordinary purchaser. But however this may be, and we find it necessary to make no decision in regard to it, the power of the trustees, with the assent and concurrence of the beneficiary, to execute the leases which have been recited, except as to the provision for sale, is not open to reasonable doubt. The contention in that regard is that the leases in question were not properly and sufficiently executed by the parties in interest; that only in two cases has the railroad company joined in such execution, the leases of 1872 and 1888; that only in one instance, the lease of 1883, has the beneficiary, the life tenant of the property, joined; that the lease of 1892 was executed only by one of the three trustees, and is wholly invalid; and that all these leases are now at an end and wholly inoperative for any purpose.

We find no merit in this contention. There is no ground whatever in law for the assumption that the signature or formal execution of the railroad company was necessary to the validity of any of the leases; and as to the other objections it is sufficient to say that the life tenant of the property and the beneficiary of the trust during her life, who was and is the sole substantial party in interest, ratified and sanctioned all the leases in question, and has received for upwards of twenty-five years all the rent specified in them to be paid by the lessee. Neither she nor her trustees can now be permitted to repudiate them. Least of all, will a court of equity allow such repudiation. In equity at least, if not at law, the leases were her leases rather than those of her trustees; and we are not sure that she was not entitled to deal with the property without the intervention of any trustees, and to rent and lease the same at her pleasure, so as to render it productive of income. She was the life tenant, entitled to the use and occupation of the property in her own right, and to receive the income therefrom directly for her own use and upon her own acquittance or receipt, without the intervention of trustees, and for most of the time she was

absolutely *sui juris, a feme sole,* and competent to deal with
her own affairs as she thought proper. It is difficult, there-
fore, to see why she was not empowered, at all events in
equity, to rent and lease this property at her own pleasure.
The function of the trustees under the will of Catherine
Pearson would seem to have been to secure her life estate
and her use and enjoyment of the property from marital
control and marital liability rather than to interfere with her
management of the estate. In their assumption of such
management they acted rather as her agents than as trus-
tees having independent control of the property.

It is of no consequence, therefore, that Mr. Winslow alone
executed the last formal lease that was given, that of 1892.
He was then to all intents and purposes the sole trustee act-
ing in the execution of the trust. Mr. Justice Cox had been
relieved and discharged from the trust by decree of court
of June 13, 1892; and Mr. Jay would seem to have become
a nonresident of the District of Columbia and of the United
States, and to have abandoned all active part in the adminis-
tration of the trust, if, indeed, it required action on his part.
Under these circumstances, Winslow's lease of the property,
ratified by the life tenant and for the time being the sole
beneficiary, who received and who has continued to receive
to this day the consideration for it, which was the income
contemplated by the will of Catherine Pearson, cannot now
be questioned. Certainly it cannot be questioned in a court
of equity, after the term created by the lease has expired
and the beneficiary has derived from it all the consideration
required in it to be rendered by the appellant.

Omitting from our consideration the clause of the lease
of 1892 which provides for the privilege of purchase by the
lessee of the property, which provision may for all present
purposes be segregated from the instrument, we find no
reason for holding that this lease is not a valid lease binding
on the trustees of the estate and binding on the beneficiary
and life tenant. The covenant for renewal therein con-
tained is not an unreasonable or improper covenant; and we
understand it to be conceded on behalf of the appellees that

it is a valid and binding covenant, and that the appellant is entitled to one renewal of the lease, if the lease itself is valid and binding. This concession, which is a just and proper one, dispenses with the necessity of any discussion of this point; and being of the opinion, as we have already stated, that the lease is a good and valid lease, it follows in our judgment that the appellant is entitled to the renewal of it from the first day of August, 1897, for the term of five years thereafter which it seeks under the bill of complaint in this case. Being so entitled, it is not liable to proceedings for dispossession or any other similar proceedings; and the proceedings instituted against it and which it is sought by this suit to restrain should be perpetually enjoined.

But there is another and a higher ground upon which our conclusion in this case can be based.

That the appellant entered upon the use and occupation of the property in controversy with a view to its purchase when such purchase could properly be effected, we think is very clear. And that this purchase was postponed for a time merely on account of some alleged or supposed deficiencies in the title, which could be removed, and which, if Mr. Winslow's statement in 1899 be correct, were in fact removed at or before that year, we think to be a fair inference from the record. What the character of the use and occupation of the land by the company was to be, and was understood by all the parties to be intended to be, we think also to be entirely clear. Over and through this land the railroad company constructed what is known as its Metropolitan branch, part of a great highway between Washington city, the adjoining States and the great West. This great highway is not a merely private enterprise, nor a matter of purely private concern; it is a public road, constructed for public purposes, under sanction of the public authority, and over which the public have rights, which cannot be permitted to be obstructed, much less destroyed, either by the company itself to which the franchise has been granted as a public trust to construct and operate this road, or by antagonistic parties claiming the ownership of the land upon

which it has been permitted to enter without previous payment therefor, or as the result of any private controversy between the railroad company and such parties. It is very clear that the appellees knew the purpose for which the land was needed, and for which it was subsequently and is now used; and that, with full knowledge of such purpose and intending that such purpose should be carried into effect, they authorized the railroad company to enter upon the land and to construct the road thereon. The best evidence of the license so given to enter is to be found in the lease given at the time and the successive leases executed thereafter; and it is beyond question that such license was given to the company. This license was not solely for the benefit of the railroad company, but primarily for the benefit of the public, which required this construction for its use. The license was in effect a dedication of the land for a highway, subject, of course, to the right of compensation therefor, which can be enforced in a proper way, but not by the dispossession of the company or the destruction of the public easement. The license to enter and construct the road is in its nature irrevocable. It cannot be recalled, except as the result of the destruction of the railroad company and the abandonment of the franchise. It is well-settled law that an action at law for the dispossession of the railroad company cannot be maintained in such a case, if the company is willing to make compensation for the use and occupation of the land. *Railroad Co.* v. *Stanley,* 35 N. J. Eq. 283; *Railroad Co.* v. *Bruce,* 102 Pa. St. 23; *Taylor* v. *Railroad Co.,* 63 Wis. 327; *Provolt* v. *Railroad Co.* 57 Mo. 256; *Railroad Co.* v. *Turner,* 31 Ark. 494.

Assuming that there is grave doubt whether the trustees under the will of Catherine Pearson had authority under that will to enter into the contract of sale to the railroad company, which they incorporated into their several leases, we do not think that the contract is one of which specific performance should be decreed in equity under the circumstances of this case. Even when a contract is free from doubt, it is well-settled law that specific performance will not

always be decreed. Specific performance generally rests in the sound judicial discretion of the court of equity. In the present case the railroad company has another remedy, plain and adequate, whereby to preserve its own rights and those of the public in the premises, that of the exercise of the right of eminent domain vested in it by its charter and by the act of Congress which authorized its entrance into this city and District; and it is both its right and its duty to exercise that right by taking steps in the present suit or otherwise, as it may be advised, to ascertain the value of the use and occupation which it desires of the land in question and to make compensation therefor to the owners of the land. *Railroad Co.* v. *Stanley,* 35 N. J. Eq. 283; *Drury* v. *Midland RR. Co.,* 127 Mass. 571; *Railroad Co.* v. *Bruce,* 102 Pa. St. 23; *Railroad Co.* v. *Johnston,* 59 Pa. St. 290; *Taylor* v. *Railroad Co.,* 63 Wis. 327; *Provolt* v. *Railroad Co.,* 57 Mo. 256; *Railroad Co.* v. *Turner,* 31 Ark. 494; *Gilman* v. *Railroad Co.,* 37 Wis. 317; *Railroad Co.* v. *Lewton,* 20 Ohio St. 401; *Trenton Water Co.* v. *Chambers,* 1 Stockt. 471; *Railroad Co.* v. *Booraem,* 1 Stew. Eq. 450.

The case of *Railroad Co.* v. *Stanley,* above cited, is directly in point. There the owners of land, on which a railroad company proposed to construct its railroad, entered into an agreement with the company for the use and occupation of the land by the latter, in consideration of the establishment of a depot or station thereon by the company, and certain arrangements for the running of trains. The company took possession of the land and constructed its railroad, but failed to build the station. It became insolvent, and its property and franchises were sold under foreclosure, and another company, organized under the general laws of the State, became the owner and possessor of them. Ejectment was instituted by the owners of the land against this latter company to recover possession of the property; and the company thereupon filed a bill in equity to stay the proceedings. The Court of Errors and Appeals of the State of New Jersey held that the complainant company was entitled to the injunction which it prayed.

The other cases cited are substantially to the same effect; and the principle established by them, adverse to the right of the owners of the land to repossession, seems to be fair and just, and to afford a proper criterion for the determination of the case now before us.

In view of what has been said, we are of opinion that, under the provisions of the lease of 1892, executed by Francis Winslow, trustee, for and on behalf of the life tenant, Mrs. Eliza W. Patterson, the appellant was and is entitled to one renewal of such lease for the term of five years from and after the first day of August, 1897, upon the terms and conditions of said lease as to the rents to be paid therefor; and that during the continuance of such term no suit for the dispossession of the appellant can be maintained. We are, also, of opinion that, for the time subsequent to the determination of said renewed lease for which the appellant shall require the use and occupation of said land, the appellant is entitled, and it is its duty, to acquire the right to such use and occupation, under the exercise of the right of eminent domain conferred upon it by the act of Congress, by the ascertainment of the value of such use and occupation, and payment to the owners of the land of the just compensation so to be ascertained. And the bill of complaint in this cause may be retained for the purpose of such ascertainment of value and just compensation.

It follows that the decree of the Supreme Court of the District of Columbia dissolving the injunction granted in this cause and dismissing the bill of complaint, must be *reversed, with costs; and that the cause will be remanded to that court, with directions to vacate said decree, to restore the injunction and make the same perpetual, and for such further and other proceedings as may be just and proper, according to law and in conformity with this opinion. And it is so ordered.*

An appeal to the Supreme Court of the United States was prayed by the appellees and allowed.